**John J. HEMMERT, Plaintiff,**

v.

**QUAKER OATS COMPANY, Defendant.**

**No. C–3–98–336.**

United States District Court, S.D. Ohio, Western Division.

Dec. 26, 2000.

---

Alfred John Weisbrod, Weisbrod Law Offices, Scott W. Earhart, Weisbrod & Lopez Co., Dayton, OH, for Plaintiff.

Teresa D. Jones, Thompson, Hine & Flory, Dayton, OH, Karen J. Moss, Martin Harris, Connelly Sheehan Moran, Chicago, IL, for Defendant.

DECISION CONDITIONALLY SUS-
TAINING DEFENDANT'S MO-
TION FOR SUMMARY JUDG-
MENT (DOC. # 29); FURTHER
PROCEDURES ORDERED OF DE-
FENDANT; THIS DECISION IS
NOT A FINAL, APPEALABLE OR-
DER

RICE, Chief Judge.

This litigation stems from Plaintiff John J. Hemmert's former employment relationship with Defendant Quaker Oats Company ("Quaker"). Following his termination, ostensibly as part of a work-force reduction, Hemmert commenced the present litigation, alleging age discrimination in violation of both the Age Discrimination in Employment Act ("ADEA") and Ohio law. He also alleged intentional infliction of emotional distress in violation of state law. (Doc. # 1). On August 9, 1999, the Court filed a Decision and Entry, dismissing Hemmert's state-law age discrimination and emotional distress claims. (Doc. # 17). Following that ruling, only Hemmert's ADEA claim remained viable. Now pending before the Court is Quaker's Motion for Summary Judgment (Doc. # 29), directed toward the remaining ADEA claim.

I. *Factual Overview*[1]

John Hemmert began working for Quaker in 1979 as a Territory Manager involved in sales. Over the following years, he received a number of promotions. In 1984, he was named the Midwest Region Manager for the company. At that time, he supervised an office staff and four District Managers, and his sales territory included Illinois, Wisconsin, Minnesota, Iowa, Nebraska, Ohio, Indiana, Michigan and Kentucky. (Hemmert affidavit, at ¶ 8). As Midwest Region Manager, Hemmert also was responsible for servicing Gordon Foods, which was Quaker's largest customer. (*Id.*).

In 1989, Hemmert was named Director of National Sales, and he had responsibility for all of Quaker's "base products" business.[2] (*Id.* at ¶ 10). Later that year, the company acquired Continental Coffee, venturing into the coffee business for the first time. (*Id.* at ¶ 11). From 1989 until 1991, Continental Coffee was considered a part of Quaker, but it operated separately with its own organization. (*Id.*). In 1991, however, Quaker began fully integrating the

---

1. For purposes of ruling on the Defendant's Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Plaintiff, who is the non-moving party. In its substantive analysis, *infra,* the Court will recite additional pertinent facts, again construing those facts and all reasonable inferences most strongly in favor of the Plaintiff.

2. Quaker's "base products" unit was involved with the sale of food items such as oatmeal and cold cereal.

operations of Continental Coffee sales with its base products sales through an initiative known as "vision" re-engineering. (Hemmert depo. at 119). As Director of National Sales, Hemmert bore the responsibility for meshing Continental Coffee's operations with Quaker's base products. (Hemmert affidavit at ¶ 11–12). In order to prepare for this task, he learned the coffee business "from the ground up" by attending a training program known as "coffee college." (*Id.* at ¶ 12). After receiving this training, Hemmert developed "the sales organization and the method and plan for that sales organization to sell coffee along with base." (*Id.*).

On June 1, 1993, Hemmert voluntarily resigned from his position with Quaker to pursue an outside business interest. (*Id.* at ¶ 14). Just two months later, however, in August 1993, he returned to the company and accepted a lower-level position as a Field Sales Manager. When he returned to Quaker, Hemmert was forty-eight years old. (Hemmert depo. at 53–54). In his new position, Hemmert earned approximately $50,000 less per year than he had as Director of National Sales. His territory as a Field Sales Manager included Ohio, most of Indiana and all of the coffee vending business in Kentucky. (Hemmert affidavit at ¶ 15). In 1994, Quaker purchased an entity known as Maryland Club Coffee, which had been a division of the Procter & Gamble Company, and Hemmert also assumed responsibility for integrating this new business into his sales area. (*Id.* at ¶ 17).

On May 15, 1995, Quaker terminated Hemmert's employment, effective June 15, 1995, purportedly as part of a workforce reduction. (Hemmert Hrg. at 73).[3] At the time of his termination, Hemmert was fifty years old. (*Id.* at 75). From his

return to Quaker on August 15, 1993, until his termination, Hemmert received only one performance evaluation, which indicated that he "meets all or exceeds some expectations." (Hemmert affidavit at ¶ 18). During his more than sixteen years with Quaker, Hemmert never received an adverse performance review. He was never disciplined, and he was never subjected to a remedial procedure for poorly performing employees. (*Id.* at ¶ 19).

After learning of the workforce reduction, Hemmert attempted to obtain another job within the company. Although several positions became available, he was not offered any of them. (*Id.* at ¶ 20–24). Hemmert first tried to transfer into a vacant position as a "Territory Manager" for the company's coffee unit. (*Id.* at 23). Although two such positions were open, Quaker awarded them to other displaced employees who purportedly had more practical experience in the coffee business. (Morgan Hrg. at 810–811). Following the workforce reduction, Hemmert also sought to be re-hired as a "Broker Distributor" in Florida. Quaker Vice President Paul Barron "vetoed" another employee's recommendation that Hemmert be given the position. (Baron Hrg. at 491). As a result, Quaker did not re-hire Hemmert.

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S.

---

**3.** The designation "Hrg." refers to sworn testimony before an Ohio administrative hearing examiner.

317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of materi-

al fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## III. *Analysis*

In Count I of his Complaint, Hemmert alleges age discrimination in violation of the ADEA. Absent direct evidence of age discrimination, which Hemmert does not purport to possess, a plaintiff asserting a disparate treatment claim bears the initial burden of presenting evidence sufficient to establish a *prima facie* case of the alleged violation. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the employer to rebut it by articulating some legitimate, nondiscriminatory reason for the employment action taken. *Id.* If the defendant meets

this burden, the plaintiff then must demonstrate that the reason offered by the employer is not its true reason, but is, instead, a pretext for discrimination. *Id.*

In the present case, Hemmert actually asserts three distinct claims under the ADEA. *First,* he contends that Quaker unlawfully terminated his employment in June, 1995, because of his age. *Second,* he argues that the company unlawfully failed to transfer him to another position during the workforce reduction because of his age. *Third,* he claims that Quaker unlawfully failed to re-hire him after his termination because of his age. As a means of analysis, the Court will review each of the foregoing claims separately, applying the three-part, burden-shifting approach set forth above.

### A. *Discriminatory Termination*

■ In support of its Motion for Summary Judgment, Quaker contends that it terminated Hemmert's employment in 1995 as part of a reduction in force ("RIF"). The RIF resulted from a restructuring of operations in Hemmert's Food Services Group. This restructuring, which was referred to as "go-to-market" re-engineering, involved the elimination of approximately sixty jobs, including three FSM positions, producing annual savings of $6.8 million in salaries and benefits.[4] In all, approximately thirty percent of the employees in the Food Services Group lost jobs.[5] (Def. Exh. R; Baron Hrg. at 383–387). In order to establish a prima facie case of discrimination in the RIF context, a plaintiff such as Hemmert must show: (1) he was discharged; (2) he was at least forty years old; (3) he was performing satisfactorily; and (4) "additional direct,

---

**4.** In his deposition testimony, Hemmert admitted that as part of the go-to-market plan, the size of Quaker's Food Services Group sales force declined. (Hemmert depo. at 96).

**5.** The Food Services Group includes both Quaker's coffee unit and its base products unit. (Baron Hrg. at 385).

circumstantial, or statistical evidence" which "tend[s] to indicate" that his age was a motivating factor in his termination.[6] *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464–65 (6th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

In its Memorandum, Quaker questions Hemmert's ability to establish a prima facie case.[7] For present purposes, however, the company has assumed, arguendo, that he can do so. Accordingly, Quaker's Memorandum focuses upon the other two parts of the burden-shifting analysis set forth above, namely its non-discriminatory reason for Hemmert's discharge and his attempt to establish pretext.[8] Concerning its non-discriminatory reason for firing Hemmert, Quaker contends that his selection for termination was the product of two interrelated factors: (1) the existence of a "no bumping" policy; and (2) the fact that he received a lower rating than the other FSMs in his region following his return to the company in August, 1993.

The record reflects that Quaker adopted its "no bumping" policy as part of its "go-to-market" re-engineering plan. The "go-to-market" initiative involved, inter alia, separating Quaker's coffee unit from its base products unit and, in the process, reconfiguring sales territories across the country. (Baron Hrg. at 369–370). The company decided to separate the coffee unit from the base products unit because the earlier merger of the two operations, as part of the "vision" re-engineering program, had proven unsuccessful. (*Id.*). As noted, *supra*, this restructuring process resulted in a loss of approximately sixty jobs in the Food Services Group, including three out of sixteen FSMs. When considering which employees to eliminate, Quaker applied a "no bumping" rule, which meant that geography determined the candidate pool for the remaining (post-RIF) jobs in a particular region, and no displaced employee could "bump" an incumbent located elsewhere in the country. In other words, only the employees who worked in a particular region were considered for the remaining FSM jobs, which were re-named as "B/D" positions.[9] For example, only the FSMs who worked with Hemmert in the redrawn Midwest region were eligible to fill post-RIF "B/D" positions in that region. In Hemmert's case, the pool of candidates in the reconfigured Midwest region included, among others, five FSMs who worked under the direction of Quaker supervisor Carol Morgan. These individuals included: (1) Hemmert; (2) Dean D'Amico; (3) Dave D'Onofrio; (4) Joe Bisacca; and (5) Mark Uvodich.

6. In a typical age discrimination case, a plaintiff satisfies the fourth requirement by showing that he was replaced by a substantially younger individual. *See, e.g., O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). In the context of a RIF, however, the fourth element is altered because the plaintiff is not replaced at all. *Barnes*, 896 F.2d at 1465.

7. In particular, Quaker contends that Hemmert cannot satisfy the fourth element of his prima facie case because he the record contains *no* evidence which tends to indicate that his age played a role in his discharge. (Doc. # 29 at 19).

8. In his Memorandum, Hemmert stresses that an Ohio Civil Rights Commission hearing examiner previously determined that he had established a prima facie case of age discrimination. (Doc. # 32 at 13). The Court need not consider what impact, if any, this determination has on the present litigation, however, given that Quaker's Motion for Summary Judgment presumes Hemmert's ability to make a prima facie showing of age discrimination.

9. As part of the 1995 workforce reduction, the job title "FSM" ceased to exist. The FSMs who remained employed following the RIF were referred to as "Customer Service Managers–Broker/Distributor" or "B/D salespeople."

According to Quaker, the second factor that led to Hemmert's RIF-related termination was his last-place rating when compared to the other FSMs in his region. Quaker supervisor Carol Morgan evaluated Hemmert and the four other FSMs on the basis of several criteria. (Morgan Hrg. at 747–748). She scored them as follows: (1) D'Amico—22; (2) D'Onofrio—22; (3) Bisacca—20; (4) Uvodich—20; and (5) Hemmert—18. (Morgan Hrg. at 747–748; Def. Exh. A).[10] As a result of (1) the "no bumping" rule, which prevented Hemmert from displacing a low-scoring FSM elsewhere in the country, and (2) his last-place score when ranked against the FSM's in his region, Quaker contends that Hemmert was not offered one of the new B/D jobs in the redrawn Midwest region.[11] Upon review, the Court harbors no doubt that Quaker has proffered a legitimate, non-discriminatory reason for Hemmert's termination. *See, e.g., Hatcher v. General Electric,* 208 F.3d 213, 2000 WL 245515 (6th Cir. Feb. 22, 2000) (unpublished) ("General Electric contends that Pfeiler's position was selected for elimination because his RIF matrix score was the lowest of the four foremen whose positions were considered for elimination, and Plaintiff concedes that this would be a legitimate, nondiscriminatory reason for the action taken."); *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455–1456 (10th Cir.1994) (recognizing that an employer acts in a legitimate, non-discriminatory manner when it makes RIF-related employment decisions based on "departmental rankings"). Consequently, the only remaining question is whether the record reveals a genuine issue of material fact with respect to the issue of pretext.

■ The Sixth Circuit has recognized that a plaintiff may establish pretext by showing: (1) that his employer's proffered reason for firing him has no basis in fact; (2) that the proffered reason did not actually motivate the discharge; or (3) that the proffered reason was insufficient to motivate the discharge. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083–1084 (6th Cir.1994). Although Hemmert does not cast his argument in the language of *Manzer,* he appears to assert that he has raised a genuine issue of material fact using the first and second approaches.

Upon review, however, the Court concludes that Hemmert has failed to establish a genuine issue of material fact under any of the foregoing methods of showing pretext. In support of his argument that Quaker's proffered reason for his discharge lacks a basis in fact, Hemmert suggests that no RIF actually took place.[12] Specifically, he contends that he was the only employee terminated. He also insists that reducing a workforce by one employee does not constitute a true RIF. (Doc. # 32 at 13–14). A review of the record and applicable case law reveals that Hemmert's argument is both factually and legally erroneous.

---

**10.** Morgan inadvertently miscalculated the scores for Bisacca and Uvodich. Although she gave them both 21 points, their scores actually add up to only 20. (Morgan Hrg. at 749–750). In any event, both Bisacca and Uvodich still scored higher than Hemmert, who received only 18 points.

**11.** According to Quaker, Hemmert was also considered for a vacant B/D job in Texas, because none of the incumbent FSMs in that territory were available to fill the job. (Bendix Hrg. at 910–913). Quaker ultimately selected Bisacca to fill the position, however, purportedly due to his receipt of a higher rating from Morgan. (*Id.*).

**12.** *See* Plaintiff's Memorandum in Opposition to Summary Judgment (Doc. # 32 at 13) ("Quaker maintains that Hemmert was terminated as a result of a reduction in force. Quaker's RIF argument is simply bogus.").

In his Memorandum in Opposition to Summary Judgment, Hemmert admits that the *integration* of Quaker's coffee unit and base products unit, as part of the "vision" re-engineering program, created additional work and increased the number of FSMs needed in the Midwest region. (Doc. # 32 at 5). Hemmert also admits that the "go-to-market" initiative, which subsequently *separated* the coffee unit from the base products unit, had the concomitant effect of reducing the workload for FSMs. (*Id.* at 6). Given that the FSMs had less work as a result of Quaker's implementation of the go-to-market plan, it stands to reason that the company would have eliminated some FSM positions. Notably, in his Memorandum, Hemmert admits that Quaker *actually did* eliminate three of those positions.[13] (*Id.* at 18). In addition, although two of the three displaced FSMs were transferred to other non-FSM positions in the company,[14] Hemmert cites absolutely nothing to controvert Quaker's evidence that approximately *sixty* employees, or nearly thirty percent of the workforce in his Food Services Group, lost their jobs as part of a RIF, resulting in savings of $6.8 million to the company.[15]

13. Hemmert stresses, however, that he was the oldest FSM at Quaker and the only one not retained by the company in some capacity. (Doc. # 32 at 6). Although Hemmert attributes his discharge to age discrimination, he has no statistical evidence to support this claim, other than the mere fact that he was the oldest FSM and the only one discharged by the company. These facts may be sufficient to satisfy the final element of Hemmert's prima facie case. *Skalka v. Fernald Environmental Restoration Management Corp.*, 178 F.3d 414, 421 (6th Cir.1999) (quoting *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (internal quotation omitted)) (reasoning that, in the RIF context, an ADEA plaintiff may satisfy the final element of his prima facie case with evidence "that persons outside the protected class were retained in the same position"). The mere fact that Hemmert was the oldest FSM, and the only one fired as part of the RIF, however, does not create a genuine issue of material fact on the question of pretext. In other words, Hemmert's status as the oldest FSM, and the only one not retained by the company, reasonably might give rise to an inference of age discrimination, thereby compelling Quaker to come forward with a non-discriminatory reason for his termination. Notably, however, both Quaker and the Court have presumed that Hemmert can establish a prima facie case, and the company has articulated a nondiscriminatory reason for his discharge, namely his relatively low rating when compared with the other FSMs in his region. Hemmert cannot show that Quaker's reason is pretextual simply by pointing out, once again, that he was the oldest FSM and the only one not retained in some capacity. Such an argument does not cast any doubt upon the validity of Quaker's explanation. *Cf. Lewis v. Aerospace Community Credit Union*, 114 F.3d 745, 749 (8th Cir.1997) (reasoning that the act of firing all three managers over the age of fifty was sufficient to establish a prima facie case under the ADEA, but it was insufficient to create a genuine issue of material fact on the question of pretext); *Collier v. Budd Co.*, 66 F.3d 886, 891–892 (7th Cir.1995) (finding that the employer's act of discharging two of its three oldest employees in a RIF was sufficient to satisfy the final element of the plaintiff's prima facie case, but requiring additional evidence to raise a genuine issue of material fact on the question of pretext).

14. The two FSMs who received transfers are Jim Kerin and Adrienne Cregar. Although he was slated for termination as part of the RIF, Kerin received a transfer to Quaker's coffee unit for reasons that will be discussed more fully, *infra*, in the Court's analysis of Hemmert's "failure to transfer" claim. Cregar, who was one of Quaker's best FSMs, received a lateral transfer into a newly created "Operator CBM" position. (Zabcar Hrg. at 633–634). Quaker considered Cregar to be "an exemplary model" employee for this new job. (*Id.*).

15. As part of the RIF, Quaker's sales force, which included FSMs and other job categories, was reduced by eleven positions. The company terminated nine of the eleven displaced salespeople. The remaining two were transferred to other positions. Of the nine terminated salespeople, the Court notes that seven of them were younger than 40 and, therefore, were outside of the protected age

In fact, when asked if other employees had lost their jobs as part of a RIF, Hemmert previously admitted that some had, although he was unsure of the specific number. (Hemmert Hrg. at 96–100). In any event, even assuming, purely arguendo, that Hemmert was the only Quaker employee terminated, such a fact would not demonstrate the non-existence of a RIF. The Sixth Circuit has recognized that eliminating a single job can constitute a legitimate RIF. *See Barnes*, 896 F.2d at 1465 (noting that a RIF "occurs when business considerations cause an employer to eliminate one or more positions"). For the foregoing reasons, Hemmert has failed to raise a genuine issue of material fact as to whether a RIF actually occurred.

In order to establish pretext, Hemmert also appears to suggest that his relatively poor RIF evaluation score is inaccurate, or "factually false." In particular, he contends that supervisor Carol Morgan arbitrarily gave him a low rating, despite the fact that he had performed as well as the FSMs with whom she compared him. In support of this assertion, Hemmert notes that he and the other four FSMs evaluated by Morgan all had received the same overall rating on their 1994 annual reviews: "meets all or exceeds some expectations." (Doc. # 32 at 7–8).

Upon review, the Court concludes that Hemmert's evidence in support of his claim of discriminatory discharge fails to establish a genuine issue of material fact on the question of pretext for at least three reasons. *First,* Hemmert's satisfactory performance in 1994 simply is not evidence of pretext, given that his termination occurred as part of a RIF. As Quaker properly notes, "in a reduction of force [context], someone has to be let go." *Rea,* 29 F.3d at 1456. Thus, the fact that Hemmert and the other FSMs in the Midwest

region had performed satisfactorily in 1994 is insignificant. As the Eighth Circuit recognized in *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 779 (8th Cir.1995), "even capable employees are released when an employer is down-sizing, and therefore evidence of competence is not particularly probative." In other words, Hemmert was not terminated for unsatisfactory job performance. Rather, he was terminated as part of a RIF, which compelled Quaker to discharge a number of its employees, *despite* their adequate job performance. *Cf. Nitschke v. McDonnell Douglas Corp.,* 68 F.3d 249, 252 (8th Cir. 1995) ("McDonnell Douglas does not claim that it dismissed Nitschke because he was incompetent. Rather, it claims to have done so because, according to the performance criteria on which the employee rankings were based, Nitschke was the least competent employee in the Maintenance Purchasing Section. Therefore, Nitschke's evidence regarding his competence does not discredit McDonnell Douglas's explanation for his termination.").

*Second,* the Court finds no inconsistency between the 1994 annual reviews and the 1995 RIF-related evaluations. Uncontroverted evidence establishes that only three rating categories were available on Quaker's annual review forms: (1) "far exceeds" expectations; (2) "meets all" or "exceeds some" expectations; and (3) "below" expectations. (Morgan Hrg. at 671–673). As a result of these limited choices, the fact that certain employees received the same annual review rating did not necessarily mean that their job performance was identical. (*Id.* at 673). In fact, Morgan testified that approximately ninety percent of Quaker's employees received exactly the same annual review rating that Hemmert received. (*Id.* at 672–673). In

group. Only two of the terminated salespeople, Hemmert and an individual named "Hagerton," were over the age of forty. (Doc. # 33 at Exh. NNNN).

the context of Quaker's RIF, however, Morgan necessarily had to differentiate between Hemmert and the other FSMs, despite the fact that they had received identical ratings on their 1994 annual reviews.[16]

*Third,* contrary to Hemmert's assertion that Quaker rated him solely on the basis of subjective criteria, Morgan's decision to rank him last among the FSMs under her supervision during the RIF process is well supported by unrefuted *objective* evidence. During fiscal year 1994, for example, Hemmert had two primary performance goals, both of which were established in advance and in writing. The first objective was to achieve total sales revenues of at least $6.4 million for the year. The second objective was to reach certain targets for product sales in at least three out of five categories. Hemmert failed to reach either objective. With respect to sales revenues, he fell $400,000 short of his target. With respect to product sales, Hemmert reached his target in only two of the five categories. (Morgan depo. at 83–84;

Hemmert depo. at 62–63). In addition, Morgan applied a mathematical scoring system to the sales performance of Hemmert and the other FSMs under her supervision. Hemmert received a score of 33 percent, which was the lowest in his group.[17] (Morgan Hrg. at 664–671). Hemmert also ranked last in total sales for the period from July 1, 1994, through April 30, 1995, which was the last full month before RIF decisions were made. (*Id.* at 709–710).

In addition to the foregoing sales figures, Quaker cites other evidence explaining Hemmert's selection for termination as part of the RIF. In March, 1995, one of Quaker's brokers complained to Morgan that Hemmert was unwilling to "roll up [his] sleeves and do what was necessary to execute the company's objectives within the field." (*Id.* at 718). In 1995, Morgan also received a written report showing that Hemmert and his brokers had made 509 sales calls, just three more than the required minimum of 506.[18] (*Id.* at 680). By comparison, the other FSMs and their bro-

---

16. In finding that Morgan's 1994 annual reviews and her 1995 RIF-related evaluations are not contradictory, the Court notes that it is not "weighing" the evidence. Indeed, the Court could not "weigh" that evidence because it does not conflict. As noted above, in the context of a RIF, an employer *must* terminate one or more employees. Therefore, despite the fact that Hemmert and his coworkers all received the same favorable evaluations in 1994, Morgan had to differentiate between those employees (all of whom were performing adequately) in order to carry out the 1995 RIF. As a result, she evaluated Hemmert and the others in 1995 under a more refined system, as opposed to the 1994 evaluation process, which required Morgan to place her employees in one of only three categories. If the mere fact that Morgan reevaluated Hemmert and the others as part of the RIF were found sufficient to create a genuine issue of material fact, such a conclusion would preclude employers from attempting to choose the *best* employees to retain in a workforce reduction situation.

17. D'Amico received a score of 118 percent, D'Onofrio received a score of 118 percent, and Uvodich received a score of 38 percent. Bisacca, the final FSM under Morgan's supervision, could not be evaluated under this system because he had been in his position for less than a year. (Morgan Hrg. at 671).

18. In his deposition, Hemmert challenged the accuracy of the report showing that he and his brokers had made just 509 sales calls. (Hemmert depo. at 58). He argued that the "data [were] collected in a very bogus way." (*Id.*). When asked how the data were collected, however, he stated, "I really don't know.... It was just bogus." (*Id.* at 58–59). Hemmert then admitted that he lacks personal knowledge concerning the collection of the data. (*Id.* at 60). Hemmert also admitted that he has no personal knowledge of any facts suggesting that the recorded figures are incorrect, and he never made such a suggestion to Carol Morgan. (*Id.* at 62).

kers had made many more calls, even though they all had the same required minimum of 506.[19] (*Id.* at 680–682). Finally, a short time before the RIF, Morgan received complaints about Hemmert from Larry Abbott, the president of Abbott Foods, which is a key distributor of Quaker products in Columbus, Ohio. (*Id.* at 711–714). Larry Abbott accused Hemmert of trying to persuade one of Abbott's major customers to stop doing business with Abbott Foods. (*Id.; see also* Def. Exh. MM). Hemmert admits that, as a result of this incident, he essentially had a dysfunctional relationship with Larry Abbott, who barred him from setting foot on the premises of Abbott Foods. (Hemmert depo. at 87–88). In light of the foregoing unrefuted evidence, Hemmert has failed to demonstrate a genuine issue of material fact as to whether his relatively low evaluation as part of the RIF process is inaccurate or "factually false." [20]

In a final argument, Hemmert appears to suggest that Quaker's RIF did not actually motive the company to terminate his employment. In support of this theory, Hemmert contends that Quaker reconfigured its sales territories, established a "no bumping" rule and "went to the trouble of 'restructuring' " as a subterfuge to conceal its age discrimination against him. He also argues that "Quaker could not afford to evaluate under reasonable and objective criteria" because doing so would have resulted in his retaining his employment. In order to avoid that result, Hemmert contends that supervisor Carol Mor-

gan established "nebulous criteria" to rate his performance and "arbitrarily assigned numbers" to each of the five FSMs. Hemmert also suggests that Quaker elected to terminate his employment because he was almost fully vested in his company retirement. (Doc. # 32 at 18–19).

Notably absent from Hemmert's assertions, however, is any citation to evidence supporting them. The Court's own review of the record has revealed absolutely nothing to suggest that Quaker implemented its "go-to-market" re-engineering plan—which involved the termination of approximately sixty employees and resulted in savings of $6.8 million—as a pretext for age discrimination against Hemmert, whom the company had re-hired just two years earlier at the age of forty-eight, which was well within the age group protected by the ADEA. Nor does Hemmert cite anything beyond his own speculation to support his assertion that Quaker reconfigured its sales territories nationwide and established the "no bumping" policy in order to conceal age discrimination against him.

The record is equally devoid of evidence to support Hemmert's assertion that Morgan adopted "nebulous" rating criteria and "arbitrarily assigned numbers" to conceal age discrimination against him. As set forth more fully, *supra,* Quaker has provided unrefuted *objective* evidence supporting Morgan's evaluation of Hemmert. Finally, Hemmert's contention that Quaker terminated his employment to save

**19.** D'Onofrio and his brokers had made 930 calls. D'Amico and his brokers had made 900 calls. Bisacca and his brokers had made 834 calls. Uvodich and his brokers had made 589 calls. (Morgan Hrg. at 680–682).

**20.** Although Morgan's RIF-related evaluation of Hemmert and the other FSMs under her supervision may have involved some subjectivity, the Court notes that "subjective evalua-

tions of a job candidate are often critical to the decisionmaking process," and they "can be just as valid as objective reasons." *Chapman v. AI Transport,* 229 F.3d 1012, 1033–1034 (11th Cir.2000) (*en banc*). In any event, the foregoing analysis demonstrates that Morgan's decision to rank Hemmert last among his co-workers was amply supported by uncontroverted objective evidence.

money on his pension fails to create a genuine issue of material fact on the question of pretext, as he cites no evidence to support such speculation.[21] Consequently, for the reasons set forth more fully above, Hemmert has failed to raise a genuine issue of material fact with respect to whether Quaker's non-discriminatory reason for his termination is pretextual.

## B. *Discriminatory Failure to Transfer*

■ Hemmert's "failure to transfer" claim concerns his non-selection to fill one of two "Coffee Territory Manager" ("Coffee TM") positions that became available shortly after he received notice of his impending termination as part of Quaker's RIF.[22] The *McDonnell Douglas* burden-shifting analysis applies to this claim as well, given that Hemmert does not purport to possess direct evidence of age discrimination. Just as it did with Hemmert's discriminatory discharge claim, *supra*, Quaker once again assumes, arguendo, that Hemmert can establish a prima facie case of age discrimination with respect to its decision not to transfer him into one of the Coffee TM positions. Quaker's Motion for Summary Judgment rests upon its articulated non-discriminatory reason for its decision not to transfer Hemmert and his inability to establish pretext.

In support of its Motion, Quaker asserts that it selected two other employees, Jim Kerin and Marco LaCava, to fill the vacant Coffee TM positions because it believed that they had the most relevant experience in the coffee business. (Doc. # 29 at 25). In particular, Quaker contends that Kerin, who was an FSM at the time of the RIF,[23] previously had worked as a Coffee TM for years and "had a proven track record of

---

21. Parenthetically, the Court notes that an terminating an employee in order to save money on his pension ordinarily does not constitute age discrimination in violation of the ADEA. This is so because the vesting of most pensions depends upon an employee's years of service with a company. Although years of service often correlate with advanced age, the two concepts are analytically distinct. Indeed, a younger employee may have many years of service with one company, while an older employee may have few. Consequently, the Supreme Court has stated that an employer does not violate the ADEA by making an employment decision based on an individual's years of service. *See, e.g., Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (holding "that an employer does not violate the ADEA just by interfering with an older employee's pension benefits that would have vested by virtue of the employee's years of service," but leaving open the possibility of an ADEA violation in "the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service ... and the employer fires the employee in order to prevent vesting").

In the present case, Hemmert asserts in his Memorandum that the vesting of his Quaker pension involved a combination of his years of service *and* his age. (Doc. # 32 at 6–7). If so, a colorable argument could be made that *Hazen* is distinguishable, and that this is a "special case" in which a viable ADEA claim could exist. The Court need not resolve this issue herein, however, because Hemmert cites absolutely no evidence to support his speculation that Quaker discharged him in order to prevent the vesting of his pension benefits. Therefore, Hemmert's "pension interference" theory cannot survive summary judgment, regardless of whether such a claim might be viable if supported with evidence in the record.

22. As the parties properly note in their Memoranda, an employer is under no obligation to find another position for an employee who has been displaced as part of a RIF. *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir.1986). When an employer does decide to shift some employees to other positions, however, it cannot use age as a motivating factor when deciding whom to transfer. *Hawley v. Dresser Indus., Inc.*, 958 F.2d 720, 723 (6th Cir.1992).

23. Like Hemmert, Kerin was slated to be fired from his FSM position as part of Quaker's workforce reduction. (Morgan Hrg. at 816).

success." (Morgan Hrg. at 810). Likewise, LaCava had a "long-time background in the coffee products division" and "a solid proven track record of managing coffee distributor programs and developing important pieces of operator business." (*Id.* at 811). By comparison, Quaker contends that Hemmert "had gotten involved in the distributor management aspects of coffee, but as far as being able to develop business at an operator level, he did not have the skills" that Kerin and LaCava possessed.[24] (*Id.*). Upon review, the Court concludes that the foregoing explanation constitutes a legitimate, non-discriminatory reason for Hemmert's non-selection to fill one of the vacant Coffee TM positions. As a result, the remaining question is whether the record reveals a genuine issue of material fact with respect to pretext.

██ In his Memorandum in Opposition to Summary Judgment, Hemmert fails to mention the transfer of Marco LaCava, focusing solely on Quaker's decision to transfer Jim Kerin to one of the vacant Coffee TM positions.[25] (Doc. # 32 at 19–22). Hemmert appears to argue that Quaker's explanation for transferring Kerin is "factually false."[26] In support of

this proposition, he advances several arguments. *First*, he contends that Quaker's rationale is "ridiculous in light of the fact that [he] was required to learn coffee from the ground up and [to] attend Continental's coffee school...." (*Id.* at 20). *Second*, Hemmert argues that he worked with both coffee and base products "throughout his job as an FSM," whereas Kerin only worked with base products. (*Id.*). *Third*, Hemmert asserts, without explanation, that both he and Kerin "came from the base products division." (*Id.*). *Fourth*, Hemmert alleges that he "never received anything other than a first rate performance evaluation," and "had never been disciplined for any performance related issue." (*Id.* at 21).

Upon review, the Court concludes that Hemmert has failed to raise a genuine issue of material fact with respect to pretext. Although Hemmert has demonstrated that he had some knowledge of, and some experience with, the coffee side of Quaker's business, such a showing does not raise a triable issue of fact. In support of its Motion, Quaker contends that it perceived Kerin as being *more qualified* than Hemmert for the open Coffee TM position. The fact that Hemmert attended

24. The record reflects that Hemmert had managed two Coffee TM employees from approximately mid 1993 until mid 1995, during the period that Quaker integrated its coffee unit and its base products unit into a single sales force. (Hemmert Hrg. at 59, 104–105; Morgan Hrg. at 780). This was the only period of time during which Hemmert had "coffee responsibility." (Hemmert Hrg. at 104).

25. In the portion of his Memorandum addressing his "failure to transfer" claim, Hemmert appears to have inadvertently included part of his argument concerning his "failure to re-hire" claim, which will be addressed separately, *infra*. Hemmert's failure to re-hire claim concerns his non-selection for a "B/D" position that became available well after the RIF.

26. Although Hemmert acknowledges the three methods of establishing pretext, he fails to identify which one or more of them he believes is applicable. Instead, he suggests that Quaker's proffered explanation for his non-transfer is "absurd" and "ridiculous." (Doc. # 32 at 20). After reviewing the substance of Hemmert's argument, however, it appears to the Court that he believes Quaker's explanation is "factually false." Hemmert does not appear to argue pretext under either of the other two approaches set forth by the Sixth Circuit in *Manzer*, 29 F.3d at 1083–1084. Specifically, Hemmert does not suggest that Kerin was better qualified, but that his superior qualifications did not "actually motivate" Quaker. Nor does Hemmert argue that superior qualifications are an "insufficient" basis for electing to transfer Kerin.

the "coffee college" training session and, for a short period of time, had responsibility for Quaker's coffee line,[27] does nothing to undermine the company's non-discriminatory explanation. Carol Morgan, who made the decision to transfer Kerin to the Coffee TM position, has explained that he (Kerin) "had been with the coffee products division for a lot of years" and "had a proven track record of success in the field...." (Morgan Hrg. at 810). According to Morgan, Kerin also had "strong [coffee] product knowledge, strong industry knowledge, [and] strong competitive knowledge." (*Id.* at 810–811). On the other hand, Hemmert had played primarily a managerial role over Quaker's coffee line. Notably, his 1994 performance evaluation identified certain "priority development needs," which included the need "to learn all important aspects of Coffee program administration." (Def. Exh. LL at 6).

In any event, the Sixth Circuit has recognized that a plaintiff such as Hemmert cannot establish pretext in an age discrimination case merely by questioning the soundness of his employer's subjective business judgment. *Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir.1986); *see also Peecook v. Northwestern Nat'l Ins. Group*, 156 F.3d 1231, 1998 WL 476245 (6th Cir. Aug. 3, 1998) (unpublished) ("We have previously made clear, however, that a Plaintiff cannot demonstrate age discrimination merely by challenging the judgment of his supervisors or by questioning the soundness of his employer's business judgment."). In other words, Hemmert *cannot* avoid summary judgment by presenting evidence which merely suggests that Morgan may have exercised poor

judgment in selecting Kerin as the best candidate for the Coffee TM position. In order to avoid summary judgment, he must show that Morgan's explanation reflects not merely "poor business judgment," but "a reason manufactured to avoid liability." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir.1996), *cert. denied*, 519 U.S. 1055, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). In order to make this showing, Hemmert must present facts "from which a reasonable jury could conclude that [Morgan's] 'business decision' was so lacking in merit as to call into question its genuineness." *Id.* (quoting *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2nd Cir.1988)).

In the present case, Hemmert has cited no evidence to suggest that Morgan did anything but exercise her reasonable business judgment. Although Hemmert admittedly had some experience with Quaker's coffee unit, Morgan exercised her business judgment and concluded that Kerin was *better* qualified for the open position.[28] Nothing in the record suggests that her decision is so lacking in merit that its genuineness reasonably might be called into question by a jury. Finally, Hemmert's assertion that he had received "first rate" evaluations and had not been disciplined misses the mark. As the Sixth Circuit recognized in *Hartsel*, the question is not whether Hemmert was a good employee. *Hartsel*, 87 F.3d at 801. Rather, the question is whether Morgan exercised reasonable business judgment and selected Kerin based on her belief that he was the best candidate for the job. *Id.* Given Hemmert's failure to cite any evidence to the contrary, he has failed to raise a genu-

---

27. Hemmert has testified that he had "coffee responsibility" from August, 1993, to April, 1995, the time period when Quaker's coffee unit and base product unit operated as one. (Hemmert Hrg. at 104–105).

28. This conclusion is consistent with Hemmert's own deposition testimony. In his deposition, Hemmert admitted that he had *never* worked as a Coffee TM, whereas Kerin had done so in the past. (Hemmert depo. at 93).

ine issue of material fact on the question of pretext on his claim of discriminatory failure to transfer.

## C. Discriminatory Failure to Re-hire

■ Hemmert's final ADEA claim concerns Quaker's failure to re-hire him following his termination during the 1995 RIF. Specifically, Hemmert contends that he should have been re-hired to fill a vacant "B/D" position that became available approximately one year after the RIF. As with Hemmert's other ADEA claims, his "failure to re-hire" claim is properly analyzed under the burden-shifting *McDonnell Douglas* approach set forth above. In support of its Motion for Summary Judgment, Quaker once again assumes, arguendo, that Hemmert is capable of establishing a prima facie case of age discrimination. Consequently, the company proceeds directly to its proffered non-discriminatory rationale for Hemmert's non-selection.

In particular, Quaker contends that Vice President Paul Baron "vetoed" the re-hiring of Hemmert for several reasons. *First,* Baron had a low opinion of Hemmert's communication skills. (Baron Hrg. at 514). *Second,* Baron knew that Hemmert previously had been re-hired into an FSM position, and he took Hemmert's marginal performance as an FSM into ac-

count when he declined to re-hire him a second time to work as a B/D.[29] (*Id.* at 493). *Third,* Baron was concerned about once again re-hiring Hemmert into a position that was lower than his former position as Director of National Sales.[30] (*Id.* at 515). *Fourth,* Baron based his decision on his knowledge of Hemmert's skills and abilities from 1989 to 1992, when the two men had worked together at Quaker. As noted, *supra,* Hemmert had served as the Director of National Sales during that time, and Baron was not entirely pleased with his performance.[31] During Hemmert's tenure as Director of National Sales, Baron had grown concerned about his rough demeanor, his poor writing skills and his excessive use of profanity in professional settings. (*Id.* at 494–500). In light of the foregoing explanation for Hemmert's non-selection, Quaker has met its burden of coming forward with a legitimate non-discriminatory reason for its employment decision.

In his Memorandum in Opposition to Summary Judgment, Hemmert fails to address any of the foregoing issues. Rather, he attempts to establish pretext by showing that Baron did not actually "veto" his re-hiring.[32] Specifically, Hemmert contends that Baron never bothered to contact Quaker employee Don Zabcar about Hemmert's interest in the open position.

---

**29.** As noted, *supra,* Hemmert had performed relatively poorly as an FSM, compared to the other four FSMs under Morgan's supervision, and he had alienated Abbott Foods, an important Quaker customer.

**30.** In particular, Baron declined to re-hire Hemmert for the B/D position based, in part, on his perception that Hemmert "had come down in terms of where he was in ... position." (Baron Hrg. at 515). Baron explained that he did not "often see people being charged up and motivated when they're ... on [the] way down the scale-that way down on the whole career path, it just isn't there in most cases...." (*Id.*).

**31.** Hemmert has admitted that he and Baron personally "clashed" and had a difficult time "getting along" with one another. (Hemmert depo. at 38–40).

**32.** Hemmert also contends, without citation to supporting evidence, that Tony Lozzi, the individual hired to fill the vacant position, had no experience as an FSM. (Doc. # 32 at 10, 17). This assertion is flatly contradicted by the record, which reflects that Lozzi had worked as an FSM. (Morgan Hrg. at 774; Zabcar Hrg. at 645).

Given Baron's failure even to contact Zabcar, Hemmert reasons that Baron could not have "vetoed" any recommendation made by Zabcar. (Doc. # 32 at 23–24). In other words, Hemmert suggests that Quaker's proffered reason for its failure to re-hire him is factually false.

Upon review, the Court concludes that Hemmert has misconstrued the nature of Quaker's argument. The record reflects that Christine Dobda Garrison, an employee in Quaker's Human Resources Department, recommended to Baron that Hemmert should fill the vacant position. (Def. Exh. 4; Pl. Exh. 6). In unrefuted testimony, Baron explained that he vetoed *Dobda–Garrison's* recommendation, not a recommendation by Zabcar.[33] (Baron Hrg. at 491). Quaker simply has not argued that Baron vetoed a recommendation made by Zabcar (who *never* made such a recommendation to Barron). Consequently, the fact that Baron never contacted Zabcar about Hemmert is irrelevant, and it does not raise a genuine issue of material fact with respect to whether Quaker's non-discriminatory reason for failing to re-hire him is factually false.

## IV. *Conclusion*

Based upon the reasoning and citation of authority set forth above, the Defendant's Motion for Summary Judgment (Doc. # 29) is *conditionally* sustained. In ruling upon the present Motion for Summary Judgment, the Court has relied upon and cited numerous Exhibits that have been provided by Quaker. Those Exhibits consist primarily of deposition excerpts, excerpts of testimony before the Ohio Civil Rights Commission, and copies of exhibits

that were presented to the Ohio Civil Rights Commission hearing examiner. The foregoing Exhibits have not been authenticated by affidavit. Nor has Quaker filed full copies of the various transcripts with this Court. As a result, the Exhibits provided in support of Quaker's Motion do not constitute proper Rule 56 evidentiary materials. The Defendant is directed to authenticate, *within ten days*, the evidence upon which the Court has relied herein to sustain Quaker's Motion for Summary Judgment. If such authentication is filed, this Decision will become final and judgment will be entered thereon. The Defendant's failure to authenticate this evidence will result in the Court revisiting its ruling, without relying upon the unauthenticated materials.

---

33. Parenthetically, the Court notes Zabcar's unrefuted testimony that he *would not* have been interested in re-hiring Hemmert. (Zabcar Hrg. at 635). In particular, Zabcar expressed concern about Hemmert's "work ethic." (*Id.*). This concern stemmed from a mid-morning telephone call that Zabcar had

made to Hemmert's home on a work day shortly before the RIF. When Hemmert answered the phone, he mentioned that he was still in his bathrobe and indicated that his sales territory "was operating by itself." (*Id.* at 635–636).