**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 7, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

VALENTINO ZUNIGA,

      Plaintiff-Appellant,

v.

THE BOEING COMPANY,

      Defendant-Appellee.

No. 04-5033
(D.C. No. 02-CV-807K(J))
(N.D. Okla.)

---

**ORDER AND JUDGMENT** *

---

Before **LUCERO**, **PORFILIO**, and **BALDOCK**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff Valentino Zuniga appeals from the entry of summary judgment for defendant Boeing in this action brought under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-34.  He challenges his reduction-in-force (RIF) termination after twenty-one years' employment with Boeing.

Mr. Zuniga was 62 years old at the time of his discharge, and he claims that he was selected for the RIF by his supervisor, David Reid (who was 36 years old), based on his age.  Using the analytical framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the district court concluded that Mr. Zuniga established a prima facie case of age discrimination because he demonstrated replacement by a 43-year-old woman when Boeing "claimed a need to eliminate his position." Aplt. App. at 28, 25;  *see Perry v. Woodward*, 199 F.3d 1126, 1140 (10th Cir. 1999) ("[T]he termination of a qualified minority employee raises the rebuttable inference of discrimination in every case in which the position is not eliminated.").  But the district court ultimately granted summary judgment in favor of Boeing on its conclusions that (1) "[Mr. Zuniga had] not offered sufficient evidence to permit a jury to find that the employer's asserted justification is false"; (2) he had not "eliminated all legitimate reasons for his termination"; (3) "[t]he decision to terminate [Mr. Zuniga did] not appear to have

been pretextual or motivated by a prohibited reason"; and (4) his termination was the result of a "legitimate RIF." Aplt. App. at 39 & n.13.

On de novo review, *see Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10 th Cir. 2002), we conclude that Mr. Zuniga demonstrated genuine issues of material fact regarding pretext that, under controlling precedent of this circuit, preclude the entry of summary judgment for Boeing. We therefore reverse and remand for further proceedings.

## I. Standard of review

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.

. . . .

In cases brought under . . . the ADEA where circumstantial evidence is the basis for the claim, our analysis at the summary judgment stage is governed by the burden-shifting framework laid out in *McDonnell Douglas . . . .*

The *McDonnell Douglas* test involves a three-step analysis. First, the plaintiff must prove a prima facie case of discrimination. If the plaintiff satisfies the prima facie requirements, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must either show that his race, age, gender, or other illegal consideration was a determinative factor in the defendant's employment decision, or

show that the defendant's explanation for its action was merely pretext.

*Garrett*, 305 F.3d at 1216 (citation and quotation marks omitted).

A plaintiff can withstand summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual. A plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason.

*Id.* at 1217 (citation and quotation marks omitted).

## II. Analysis

Boeing relied on an "Employment Reduction Process" (ERP) as the basis for its decision to select Mr. Zuniga for the RIF. Aplt. App. at 21. The process initially consisted of a manager's baseline, subjective assessment of three areas related to each employee's job performance,[1] and Boeing's current and future needs. *See id.* at 44, 57, 60. The first assessment measured ten competencies or skills identified as appropriate for a particular job group. *Id.* at 21, 44. The competencies assessed were knowledge of the company business, materials management abilities, ability to work with people, problem solving/judgment,

---

[1] The parties also referred to the ERP assessment form as the ABC ranking form because the employees were subsequently placed into A, B, and C categories based on their ERP scores. *See, e.g.,* Aplt. App. at 22, 133.

adaptability/flexibility, customer satisfaction, initiative, dependability, integrity, and attention to detail. *Id.* at 44. This assessment accounted for 60% of the employee's overall ERP score. *See id.* at 21, 44. A second portion of the assessment measured the employee's performance in relation to Boeing's business goals and objectives, and it accounted for 25% of the score. *Id.* A third portion of the assessment measured the employee's performance in relation to Boeing's "2016 values"; it supplied 15% of the 100-point total score. *Id.* The employee's total ERP score was then used for the purpose of determining which employees, in comparison with their peers, had the best knowledge, skills, and abilities to meet Boeing's current and future business needs. *See id.* at 57 (instructing managers to be sure that the "assessments provide the ability to distinguish the skills and competencies that one employee possesses as compared to others in the selection group"). The comparison was accomplished by ranking all the employees in the particular job group from first to last, depending on each employee's total ERP assessment score and placing them in an A (top 40%), B (next 30%), or C (bottom 30%) category. *See id.* at 45, 66. The C-category employees who scored lowest were to be the first employees terminated under the RIF. *Id.* at 22.

Boeing argued that it was entitled to summary judgment because Mr. Zuniga's ERP score ranked him as 21st out of 23 employees in his job group, thus qualifying him for the RIF and establishing a legitimate, nondiscriminatory

reason for Mr. Zuniga's termination as a matter of law. But Mr. Zuniga argues that he presented evidence that is not only a sufficient basis from which a jury could reject Mr. Reid's asserted reasons for rating him low on the ERP, but that it is also sufficient to demonstrate that his age was a determinative factor in his termination. We discuss each type of evidence below.

## A.  Replacement with younger employee.

The Supreme Court has noted that a jury may "reasonably infer from the falsity of [an] explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000) (quotation marks omitted). When the employer's proffered explanation for termination is challenged and eliminated or proved false, "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* Mr. Zuniga showed that he was replaced by a younger employee with less experience when Boeing "claimed a need to eliminate his position." Aplt. App. at 25-28. The district court acknowledged the problem with not denying summary judgment on this ground, but stated that Mr. Zuniga had "fail[ed] to offer this as evidence of pretext. From the limited evidence

offered regarding [the replacement], the Court cannot discern pretext on this fact alone." *Id.* at 39 n.13. But at the summary judgment stage, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1216 (10th Cir. 2003) (quotation marks omitted). And it was not the district court's function to make a factual finding about pretext–that is for the jury. *See id.* (stating that "the weighing of the evidence . . . [is a] jury function[], not [that] of a judge").

Nor was it Mr. Zuniga's burden to produce evidence regarding his replacement at this stage other than to establish that he had been replaced by a younger, less-experienced employee during an alleged RIF. Upon this prima facie showing, it was Boeing's burden on summary judgment to establish that there were no genuine issues of material fact regarding an alleged, legitimate reason for Mr. Zuniga's termination. *See Garrett*, 305 F.3d at 1216. Boeing's "decision to reduce its workforce does not in itself legitimate [its] choice to fire the employee from the protected class rather than the younger employee." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1167-68 (10th Cir. 1998). Boeing's failure to meet its burden should have precluded the granting of summary judgment in its favor. *See id.* at 1168.

**B. Evidence that scores used to make RIF choices were inconsistent with prior performance evaluation.**

> [T]he evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms. . . . A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual. A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000) (citations and quotation marks omitted).

We have stressed that subjective judgments are viewed with skepticism in the pretext inquiry. *See Garrett*, 305 F.3d at 1217-18 (collecting cases and holding that subjectivity by decision-maker in termination decision is relevant evidence of pretext); *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) ("Evidence of pretext may include . . . the use of subjective criteria."); *Bauer v. Bailar,* 647 F.2d 1037, 1046 (10th Cir. 1981) (stating that, although subjective criteria is not wrongful *per se,* "[o]bviously subjective decision making provides an opportunity for unlawful discrimination").

Accordingly, this court has recognized on numerous occasions that a plaintiff can defeat summary judgment by demonstrating that an evaluation offered to justify his termination conflicts with other assessments of his work performance. *See, e.g.*, *Garrett*, 305 F.3d at 1219; *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 564 (10 th Cir. 1996); *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1380 (10 th Cir. 1994). Mr. Zuniga presented evidence that his December 2001 job performance evaluation (PE) was intended to provide a basis for his January 2002 ERP scoresheet but that he was scored lower on the ERP than on the PE. The 2001 PE assessed communication abilities, problem solving/judgment, technical skills/knowledge/coaching, leadership, integrity, quality/productivity, customer satisfaction, working together effectively, health/safety, and business knowledge–areas that were also assessed on the ERP form. *See* Aplt. App. at 46, 44. As proof of the interrelationship of the two forms, Mr. Zuniga demonstrated that certain written materials instructing managers how to fill out the ERP forms used dotted arrows to show that the 2001 PE scores were to be reflected by the 2002 ERP competency assessment scores. *Id.* at 50. Thus, although only the ERP form served as the documentation for the comparison and ranking of employees in anticipation of the RIF, both documents necessarily evaluated past and current performance and job skills and competencies.

Boeing's RIF guidelines stated that employees were to be assessed by using the "most current Performance Evaluations." *Id.* at 76. Although Boeing argues that these particular guidelines were never shown to the managers before Mr. Zuniga was selected for the RIF, *id.* at 169, a former manager testified that managers were told to correlate or link the 2001 PEs with two sections of the 2002 ERP form. *Id.* at 124-26.

Mr. Zuniga then demonstrated that, while Mr. Reid rated him as "exceeds normal requirements," (ENR) (i.e., as having "superior performance that surpasses what is generally expected of employees") in the areas of problem solving, teamwork skills, and technical skills/coaching on his 2001 PE, *see id.* at 46, Mr. Reid rated him as a 3, or only "acceptable," in those same areas on two sections of the ERP, *id.* at 44. And he showed that, despite the fact that Mr. Reid rated him as "meeting normal requirements" (MNR) and communicating well with his customers, *id.* at 46, 47, he gave him only a 2.5 rating out of a possible 5.0 on the ERP (which was at the low end of the "acceptable" range) for communication performance, *id.* at 44. He argues that these discrepancies and the failure to properly follow RIF guidelines provide proof of pretext. *See Beaird*, 145 F.3d at 1168 (noting that noncompliance with a RIF guideline "can in some cases suffice to substantiate pretext").

Boeing denies a correlation between the 2001 PE and the 2002 ERP, insisting that "the [ERP] competencies are not tied to performance," while asserting that "the second and third ERP scores are performance-based, [but] the employee's performance is to be assessed relative to his or her peers." Aplt. App. at 168 (affidavit of Denise Hendrickson). Mr. Zuniga challenges this claim, and Ms. Hendrickson's affidavit quoted above is inconsistent with her deposition testimony and with other evidence. *See, e.g.*, Aplee. Supp. App. Vol. I at 412 (Ms. Hendrickson's deposition testimony stating, "[t]he competencies deal with the employee's current competencies. What are the knowledge, skills and the abilities that the employee currently has?"); Aplee. Br. at 6 (noting that in the first section of the ERP form, which accounted for 60% of an ERP score, the managers assessed their "direct reports against the competencies"); Aplee. Supp. App. Vol. I at 107 (RIF guidelines stating that "[a]ll employees are assessed to a baseline," and that managers are to "[a]pply consistent, job-related criteria to assess employees' skills and performance within each selection group"). It is difficult to understand how a baseline competency that is a statement of job skills and knowledge related to specific employment could be measured for a specific employee in any other way but to look at that employee's performance and ability. The *comparisons* between employees appears, rather, to have occurred *after* each employee had been evaluated as an individual and given a score on the ERP

forms.  The total score was used in the second step of the ERP process, which consisted of ranking all the employees in order of their ultimate ERP score.  *See id.*; Aplt. App. at 45 (relative ranking summary).

Mr. Reid claimed that he was not aware that he was supposed to use the 2001 PE as a basis for the ERP assessment, and stated that he did not refer to Mr. Zuniga's 2001 PE, or to any prior evaluations, in determining the scores he gave Mr. Zuniga for each ERP category.  Aplt. App. at 136.  He insisted that he scored Mr. Zuniga on the ERP only by comparing him to other production-control employees.

It is undisputed, however, that seven different managers from different departments evaluated the twenty-three individuals who had production-control-type jobs, and that Mr. Zuniga was ultimately ranked against all of them.  Aplee. Supp. App. Vol. II at 504.  If it is true that Mr. Reid used the methodology Boeing alleges of not relying on performance but rating Mr. Zuniga's skills and abilities only as relative to other employees in the job group in order to arrive at the bulk of his ERP score,  *see* Aplee. Br. at 18 & n.2, it is difficult to understand how Mr. Reid could have reasonably compared Mr. Zuniga to the nineteen individuals over whom he had absolutely no managerial oversight or knowledge of skills and abilities or past or potential performance.  *See Beaird*, 145 F.3d at 1169 ("There may be circumstances in which a claimed business judgment is so

idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination."). Accordingly, a jury could determine that Mr. Reid did not in fact give Mr. Zuniga the low ERP scores for the reason stated and could then infer that Mr. Zuniga's age was a determinative factor in assigning the low ERP score to him. *See Reeves*, 530 U.S. at 147.

The Ohio case relied on by the district court, *see* Aplt. App. at 12-13, is inapposite. There, the same supervisor evaluated and then ranked five employees against each other in making her RIF decision between the five employees and gave undisputed reasons for assigning the rankings given to the employees. Further, the employee had no statistical evidence indicating age discrimination; and there was no inconsistency between the previous job evaluations and the subsequent RIF assessment. *See Hemmert v. Quaker Oats Co.,* 157 F. Supp. 2d 864, 870-73 (S.D. Ohio 2000).

Denying that he had reviewed Mr. Zuniga's 2001 PE before assigning ERP scores to Mr. Zuniga, Mr. Reid claimed at his deposition to have given Mr. Zuniga lower scores on the ERP than on his PE in part because of "the possibility that the tasks could be much different in the next year or two years. We didn't know for sure." Aplee. Supp. App. Vol. I at 223. But on the PE, Mr. Reid had evaluated Mr. Zuniga as "exceeding normal requirements" in "continuously develop[ing] and advanc[ing] technical capabilities." Aplt. App. at

-13-

46. As a second reason for rating him lower, Mr. Reid stated, without explanation, that, although Mr. Zuniga had been "very approachable" and had helped newer employees learn their jobs in the past, he did not think in the future that Mr. Zuniga would be "the person that people would come to in general for direction and knowledge related to production control." Aplee. Supp. App. Vol. I at 225. But Mr. Zuniga had twenty-one years of experience in production control at Boeing (plus an additional twenty years at another manufacturing company), and Mr. Reid had previously rated him as "exceeding normal requirements" in the area of his expertise being "recognized and sought by others." Aplt. App. at 46. In the PE, Mr. Reid had also praised Mr. Zuniga's "strong technical capabilities and knowledge of the business systems related to Production control." Id. at 47.

Mr. Reid stated that another reason he rated Mr. Zuniga more unfavorably on the ERP than on the PE was because the PE was "based on the particular job that he had at that time. He was very familiar with that job–when [on the ERP], it was the fact that he very well could be taken out of that comfort zone and how well would he do out of the comfort zone in a new task." Aplee. Supp. App. Vol. I at 226. But the 2001 PE noted that Mr. Zuniga had accepted a special assignment to implement and maintain a system and had "initiated matrix for daily tracking," from which a jury could infer that Mr. Zuniga was successful at new endeavors. Aplt. App. at 46. And Mr. Reid, who had supervised Mr. Zuniga

-14-

for only a few months, admitted that he did not know how many areas Mr. Zuniga had been involved in as a production control coordinator in the past, *id.* at 144, and was not familiar with his past work experience because he never looked at a single "piece of paper from his personnel file before [he] filled out [Mr. Zuniga's ERP] form," *id.* at 135.

**C. Post hoc reasons for giving Mr. Zuniga a lower ranking.**

Mr. Reid's testimony further seems to be inconsistent. He stated that he ranked Mr. Zuniga lower than other, less-experienced employees because he did not believe Mr. Zuniga was going to be as good a coach in the future as he was in the past "with the changed circumstances," and would not be as good at problem solving in the future because he would not "be able to change with the circumstances." *Id.* at 141. But he later stated that he "thought [Mr. Zuniga would] be just as good an employee in the future as he was in the past" and downgraded him in ranking only for lack of "potential for change." *Id.* at 145. He supported his opinion that Mr. Zuniga did not have as much potential for change as other employees by stating that (1) Mr. Zuniga had not kept accurate inventory transactions in one incidence; (2) he did not want to use new tools in the machine shop that were being used plant-wide and which Mr. Reid thought "could have been helpful to him," Aplee. Supp. App. Vol. I at 237; and because (3) Mr. Zuniga was "not necessarily proactive in his communication" even though

he "communicated well when asked questions,"    id. at 238.  Mr. Zuniga points out,

however, that Mr. Reid admitted he would have been aware of this same

information when he evaluated Mr. Zuniga on his PE and gave him higher scores.

*See id.*   And we note that only the second reason given seems relevant to potential

for change.  In addition, it appears the only reason Mr. Reid gave other managers

for ranking Mr. Zuniga lower than other employees at the January 2002 ranking

meeting was his assertion that he received "numerous complaints about Val all the

time [because] . . . the inventory was not right."  Aplee. Supp. App. Vol. I at 394.

As the district court pointed out, Mr. Zuniga "vigorously disputes that

Reid's testimony supports this justification."  Aplt. App. at 23.  In the end, the

district court resolved the dispute in favor of Boeing, which was impermissible

fact finding.  As we noted recently,

> [i]t is not the purpose of a motion for summary judgment to force
> the judge to conduct a "mini-trial" to determine the defendant's true
> state of mind.  So long as the plaintiff has presented evidence of
> pretext (by demonstrating that the defendant's proffered
> non-discriminatory reason is unworthy of belief) upon which a jury
> could infer discriminatory motive, the case should go to trial.
> Judgments about intent are best left for trial and are within the
> province of the jury.

*Plotke v. White* , __ F.3d __, __ , 2005 WL 984363, *10 (10th Cir. Apr. 28, 2005).

**D.  Mr. Reid's comments as direct evidence of intent to discriminate.**

Mr. Zuniga argues that Mr. Reid's statements that he ranked Mr. Zuniga

lower than other employees because he did not have as much "potential for

-16-

change," Aplt. App. at 145, and because he may not do as well in new tasks or in different circumstances in the future, *id.* at 139-140, are themselves direct evidence of an intent to discriminate. *See Greene*, 98 F.3d at 563 (noting "that Congress' promulgation of the [ADEA] was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes such as that productivity and competence decline with old age" and that prohibited stereotypes include criteria like "Older employees are likely to be–") (quotation marks omitted). He argues that Mr. Reid's statement is indicative of an improper ageist belief that an "old dog can't learn new tricks." Aplt. Br. at 32. The district court rejected this evidence, concluding that the Tenth Circuit has held that job potential is a legitimate factor distinct from age, even when there may be a correlation between age and potential, and even if potential is a subjective criteria. Aplt. App. at 33. The district court found that Reid's statements did not reveal a discriminatory motive. *Id.* Again, we conclude that the fact finding on the issue of Mr. Reid's motive and intent was one for the jury and not for the court. *See Plotke*, __ F.3d at __, 2005 WL 984363 at *10.

**E. Evidence that younger employees were treated more favorably.**

Further, Mr. Zuniga presented objective evidence demonstrating that, while his younger replacement and other, younger retained employees were given exactly the same or lower scores as he was on the 2001 PE in certain categories,

-17-

the younger employees were given higher ERP scores for those same categories, thus causing them to be ranked higher for RIF purposes. For example, both Mr. Zuniga and his younger replacement (and some other younger employees) were rated as MNR in communication and ENR in problem solving skills on their PEs. *See* Aplt. App. at 77-78. But while Mr. Zuniga received ERP scores of 2.5 in the first category and a 3.0 in the second, his replacement (and some other younger employees) received scores of at least 4.0 in both categories. *Id.* Mr. Zuniga was evaluated as ENR in technical skills/knowledge/coaching and teamwork, while his replacement was evaluated as only MNR in those two areas. *Id.* at 78, 80. But Mr. Zuniga received ratings of only 3.0 in those two categories, while the replacement was scored as a 4.0 in them. *See id.* An employee may establish pretext in RIF context by showing that she was "treated less favorably than younger employees during the reduction-in-force." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir. 1988)

The district court discounted this evidence because the PE and ERP assessments did not use the same numerical scoring method; because the PE scores were not used "to rank these employees in relation to each other," and because Mr. Zuniga only used a "select number of [his] work group" in his analysis and also compared his scores to those of certain employees (Mr. Doyle, for example) who had been evaluated in managerial positions on their PEs but as

production-control employees on their ERPs. [2] Aplt. App. at 30-31. We conclude that it does not matter that the PE and ERP forms used different scoring methods and had different ultimate uses because each form assessed competencies and job performance and a jury is able to distinguish between the values that were represented by each form. Accordingly, the jury could conclude that Mr. Zuniga was scored less favorably on his ERP because of his age.

That Mr. Zuniga compared only a limited number of employees in the example he submitted to the district court for summary judgment purposes goes to the weight of the evidence and not to its admissibility and does not change the fact that he showed a genuine issue of material fact regarding pretext. If Boeing had desired to produce evidence regarding other employees at the summary judgment stage to explain the differences, it could have done so in its reply.

And even if Mr. Doyle and the other former manager were not comparable employees because their PEs and ERPs were based on their performance in different job categories, several of the other younger retained employees who received apparently favorable treatment were similarly situated to Mr. Zuniga, thus his evidence is not totally invalid or unreliable.

---

[2]     Mr. Zuniga's replacement was not one of these former management employees.

-19-

The district court stated that Mr. Zuniga's "selective choice of data presents a gerrymandered picture that is unreliable," and noted that he had not identified "an expert to testify to the statistical significance of his information." *Id.* at 30. The court concluded that the differences between the ERP and PE scores would not "suffice to show pretext on the part of [Boeing.]" *Id.* at 31. But, again, parsing of the evidence and determining whether managers in fact favored younger employees by bumping up their competency scores on the ERP was a jury question, and not for the district court.

We also reject Boeing's argument that, because some of the skills team members made up of the various managers agreed that Mr. Zuniga's comparative ranking was proper based on some past incidents in which he allegedly failed to keep an accurate inventory and to communicate satisfactorily, Mr. Zuniga cannot show pretext as a matter of law. If Mr. Reid in fact intended to discriminate against Mr. Zuniga because of his age by ranking him low to begin with, post hoc justifications will not vitiate or excuse the discriminatory motive. *See Garrett*, 305 F.3d at 1218-19 (noting that "the mere fact that [the plaintiff's] evaluations bear evidence of past criticism of his work habits does not negate the possibility that the justifications given for [his] drop in rank and negative evaluations . . . are pretextual. A jury could reasonably infer that [the plaintiff's] supervisors

discriminated against him by inflating and exaggerating long-standing critiques of his performance as a means of exercising . . . ageist animus towards him.").

Boeing also argues that, because two younger employees were informed of their prospective layoffs before Mr. Zuniga was terminated and two younger employees were tapped for layoff after he was terminated, he cannot show intent to discriminate because of age as a matter of law. But Mr. Zuniga showed that one of the younger employees who was supposed to be laid off before Mr. Zuniga was terminated was given a job in a different department (which Boeing asserts was the result of her applying for redeployment under established policy and that Mr. Zuniga did not apply for redeployment). He also showed that Boeing subsequently cancelled the potential layoffs of the two younger employees and then terminated James Vaughn, another employee who was over fifty-five and now the oldest employee in his job category during the subsequent RIF. While we agree that this is a hotly contested case, it is for a jury to determine whether Boeing's asserted reasons are valid or pretextual.

**F. Pattern and practice evidence.**

Mr. Zuniga sought to present evidence demonstrating that two other of the oldest employees at Boeing were terminated: James Hanna in March 2002 (the same date Mr. Zuniga was terminated), and James Vaughn in June 2003. *See Greene*, 98 F.3d at 561 ("evidence concerning make-up of the employment force

and events that occurred after plaintiff's termination were entirely relevant to the question of whether or not age was one of the determinative reasons for plaintiff's termination; and . . . *evidence not too remote in time that defendant terminated others in the 60-year-old age group would be entirely relevant to the question of defendant's policies and practices* .") (quotation marks omitted). The district court rejected and refused to consider the evidence because Mr. Hanna had worked in a different department and performed a different job, and because Mr. Vaughn reported to a different supervisor and, at the time of his termination, some of the ERP criteria and reviewing staff had changed. Aplt. App. at 34-35. The district court held that, because different supervisors were involved in the terminations, there was not a "reasonable relationship between the plaintiff's termination and others terminated simultaneously or later." *Id.* at 35-36. We disagree. The employees were all terminated or selected for the RIF within a year as part of a continuing RIF; their selection was based on similar, subjective criteria, and they all were the oldest employees in their respective departments at the time of their termination. [3] This evidence "is certainly not conclusive evidence

_____

[3] The record shows that Mr. Vaughn was rated fairly highly (10/23) on the January 2002 ERP and higher than Mr. Mattimore (12/23), who was 60 years old at the time and the oldest employee. *See* Aplee. Supp. App. Vol. I at 299. Vaughn's supervisor testified that Boeing would not allow Mr. Mattimore to take advantage of the RIF to be laid off because "his performance was too good," but he retired anyway. Aplt. App. at 163. Surprisingly, Mr. Vaughn, who (by

(continued...)

of age discrimination in itself, but it is surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, and proceed to assess the employer's explanation for this outcome." *Greene*, 98 F.3d at 561 (quotation marks omitted); *see Bingman v. Natkin & Co.*, 937 F.2d 553, 556-57 (10th Cir. 1991) (holding that district court did not abuse its discretion in admitting evidence of another, older, employee's termination that "was close enough in time to be evidence of defendant's practice in terminating older employees" even though "circumstances were different at that later time"). Boeing could not establish that there are no genuine issues of material fact on the issue of pretext, so the matter is for a jury.

## G. Disparate impact as evidence of intent to discriminate.

We reject the district court's holding that an expert witness was necessary to explain the significance of Mr. Zuniga's statistical data regarding the impact of the RIF on older employees. Juries are able to make basic inferences from simple statistical information, making an expert unnecessary. For example, an expert is not necessary to interpret statistical evidence showing that 75% of those employees who were actually terminated (or retired in lieu of termination) in Mr. Zuniga's job group (Zuniga-62, Wallingford-59, and Vaughn-56) during the

[3](...continued)
January 2003) was the oldest employee in the job category, ended up being evaluated and ranked the lowest on the next ERP, and was terminated in June 2003. *See id.* at 161-63.

RIFs were over 55 and two of them were evaluated by Mr. Reid. [4] *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 n.4 (10th Cir. 1996) ("disparate impact may be evidence of intentional discrimination in certain cases"). We conclude that a jury could disbelieve Mr. Reid's stated reasons for rating Mr. Zuniga lower on the ERP than on his PE and infer from the favorable treatment of younger employees and the disparate impact on employees over fifty-five that Boeing had an intent to discriminate on the basis of age. *Cf. Harvey by Blankenbaker v. United Transp. Union*, 878 F.2d 1235, 1244 (10th Cir. 1989) ( in determining whether seniority system is valid, a "finding of discriminatory intent can be based on indirect, circumstantial evidence including evidence of discriminatory impact"). This is not one of those cases in which "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

---

[4] It appears that the only other employee in Mr. Zuniga's job group who was actually terminated in the 2002-03 RIFs was a 46-year-old man described as a "mediocre" employee who did not perform his job well. Aplee. Supp. App. Vol. I at 372, 271-72, 504.

The judgment of the district court is REVERSED, and the cause is REMANDED for further proceedings consistent with this order and judgment. Mr. Zuniga's motion to supplement his brief with argument and recent Supreme Court law holding that ADEA claimants may allege disparate impact claims is DENIED, as that case is not relevant to the discrete issues on appeal. On remand, however, and on proper motion, the district court may determine in the first instance whether to allow an amendment to his complaint to add such a claim.

Entered for the Court

John C. Porfilio
Circuit Judge